IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 16, 2019 Session

## STATE OF TENNESSEE v. JEREMY RANDALL C. LEDBETTER

**Appeal from the Criminal Court for Davidson County**
**No. 2015-B-1160     J. Randall Wyatt, Jr., Judge**
**Steve R. Dozier, Judge**

———————————

### No. M2018-00846-CCA-R3-CD

———————————

The Defendant, Jeremy Randall C. Ledbetter, was convicted by a Davidson County Criminal Court jury of two counts of rape of a child, a Class A felony; two counts of aggravated sexual battery, a Class B felony; two counts of soliciting sexual exploitation of a minor, a Class B felony; and one count of exploitation by displaying sexual acts to a minor, a Class C felony. *See* T.C.A. §§ 39-13-522 (2018) (rape of a child), 39-13-504 (2018) (aggravated sexual battery), 39-13-529(a) (soliciting sexual exploitation of a minor) (Supp. 2011, Supp. 2012, Supp. 2013), 39-13-529(b)(1) (displaying sexual acts to a minor). The Defendant is serving an effective eighty-one years for the convictions. On appeal, he contends that (1) the evidence is insufficient to support his convictions, (2) the State's election of offenses was inadequate, (3) the trial court erred in denying his motion for a severance, (4) the court erred in admitting evidence, and (5) his sentence is excessive. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Shyanne C. Riddle (on appeal), Rob McKinney (at trial), Megan Geer (at trial), and Brittney Hollis (at pretrial proceedings), Nashville, Tennessee, for the appellant, Jeremy Randall C. Ledbetter.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Deputy Attorney General; Glenn R. Funk, District Attorney General; Alyssa Hennig, Chad Butler, and Brian Ewald, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's convictions relate to his sexual abuse of his father's girlfriend's grandson. The victim was approximately age ten when the abuse began in 2012 and approximately twelve when it ceased in December 2014. The Defendant, who was age twenty-four when the abuse began, lived with his father. The abuse occurred when the victim visited his grandmother at the Defendant's father's home.

At the trial, the victim, who was age fourteen, testified that he had known the Defendant all of the victim's life. The victim said the Defendant began sexually abusing him when the victim was age ten and in the fifth grade. The victim said the abuse continued for about two years, when the victim was age twelve.

The victim testified that the first incident of abuse occurred when the victim was visiting his grandmother at the Defendant's father's home. The victim said the first incident began in a computer room and moved to the shower, both of which were upstairs. The victim said that he had been watching television while the Defendant used a computer and that the Defendant left the room and returned with a green, cylindrical "toy" that flared at one end and had a hole through it. The victim said the toy was about seven inches long. The victim said the Defendant, who was not wearing pants, placed the toy on the Defendant's erect penis and moved the toy up and down with the Defendant's hand. The victim said the Defendant offered no explanation of what he was doing. The victim said a white substance came out of the Defendant's penis and landed on the floor. The victim said he had not known what the substance was and that the Defendant told him it was "cum." The victim said that he thought this was weird and that he left the computer room to shower. The victim said that the Defendant entered the bathroom, even though the door had been locked, entered the shower where the naked victim was showering, and placed the green toy on the victim's penis. The victim said the Defendant's hand touched the victim's penis. The victim said he had an erection. The victim said the Defendant did not speak. The victim said his grandmother and the Defendant's father were downstairs sleeping during the incident.

The victim testified that after the incident, the Defendant asked, "[W]as it fun[?]" and that the Defendant told the victim, "I'm going to get out of the shower and go back in the computer room or whatever and don't tell anyone." The victim said the Defendant threatened to kill the victim's family if the victim told anyone about the incident. The victim said the Defendant showed the victim two guns and threatened to shoot the victim's family. The victim said that one gun was black and that he thought it was a nine-millimeter "automatic" weapon. The victim said the Defendant pointed the gun at

-2-

him. The victim said that the Defendant threatened more than once to kill the victim's family and that the threats were the reason the victim did not disclose the abuse sooner.

The victim testified that the second incident he recalled involved the Defendant manually masturbating himself. The victim said this occurred no more than two weeks after the first incident. The victim thought he was watching television or using his Playstation and said he looked over to ask the Defendant a question when he saw the Defendant masturbating while the Defendant played a computer game. The victim said the Defendant stated that he was masturbating. The victim said a white substance came out of the Defendant's penis. The victim said that after the Defendant ejaculated, the Defendant made the victim sit in a chair in front of the Defendant and that the Defendant placed his arms around the victim and masturbated the victim. The victim said that after the Defendant masturbated the victim, the victim stated he needed to urinate and that the Defendant made the victim urinate in the Defendant's mouth. The victim stated that anytime he said he was going to the bathroom, the Defendant asked if he had to urinate, and that if the victim said yes, the Defendant made the victim "pee on his face and . . . in his mouth and stuff." The victim said that during these incidents, the Defendant's hand and mouth were on the victim's penis. The victim said that this occurred multiple times and that it occurred in the computer room, bedroom, and bathroom.

The victim testified that the Defendant used the green toy on the himself and on the victim on multiple occasions.

The victim testified that the Defendant also used a pink and blue toy that was shaped like the green toy. The victim said the Defendant used the pink and blue toy to masturbate both himself and the victim on multiple occasions. The victim recalled that the Defendant first used the pink and blue toy shortly after the Defendant received it. The victim said a box came in the mail and that the victim saw it and wondered what was inside. The victim said the Defendant stated he would tell the victim what was inside the box later or would not tell the victim anything. The victim said that later that night, the Defendant opened the box and took out the pink and blue toy. The victim said the Defendant used the toy to masturbate himself in the victim's presence in the computer room while unspecified others were sleeping. The victim said the Defendant also used the toy to masturbate the victim.

The victim testified the Defendant used a red and black toy with a dragon head and a cylinder on both the Defendant and the victim. The victim described the toy as being about seven inches long. The victim said the Defendant masturbated himself with

-3-

the dragon toy in the victim's presence more than once. The victim said the Defendant masturbated the victim with the dragon toy more than once.

The victim testified that the Defendant sometimes placed the toys inside a zippered compartment in a stuffed animal. The victim thought the animal was a dog and agreed it was the size of a medium dog. The victim said the Defendant placed a toy inside the stuffed animal, applied clear or white lubricant to the inside of the toy, placed his penis inside the stuffed animal, and "had sex" with it. The victim said the Defendant stated the stuffed animal had cost "a couple hundred dollars."

The victim testified the Defendant had two types and numerous bottles of lubricant, which the Defendant kept in a dresser drawer in the Defendant's bedroom. The victim said he learned what lubricant was when the Defendant told him. The victim said the Defendant had the victim taste the lubricant, explained what it was, and showed the victim how to use it. The victim said the Defendant had a bottle of "KY" and a black bottle with two red rings around the top and bottom of the label.

The victim testified that, in addition to the incidents in which the Defendant masturbated the victim, the Defendant touched the victim's penis with the Defendant's mouth and butt more than once.

The victim testified the Defendant also made the victim masturbate himself. The victim said that the Defendant gave him instructions about how to masturbate himself and that the Defendant watched the victim do it. The victim said this happened more than once.

The victim testified that, on one occasion, he and the Defendant were in the computer room, that the Defendant was masturbating the victim with the Defendant's hand, and that the Defendant stated he wanted to do something new. The victim said the Defendant bent down and placed the victim's penis in the Defendant's mouth. The victim said this was a different occasion than the one he had described in which he urinated in the Defendant's mouth. The victim that said his penis was erect when the Defendant placed it in Defendant's mouth and that the victim did not ejaculate.

The victim testified that, on another occasion, he and the Defendant were in the shower and that the Defendant placed the victim's penis in the Defendant's mouth. The victim said that, on a different occasion, he and the Defendant lay on the Defendant's bed. The victim said it was cold at the time. The victim said the Defendant removed the victim's clothes and placed the victim's penis in the Defendant's mouth.

The victim testified that on an occasion, the Defendant pushed the victim onto his back on the futon in the computer room, applied lubricant to the victim's erect penis, got on top of the victim, and placed the victim's penis inside the Defendant's butt.

The victim testified that the Defendant never placed the Defendant's penis inside the victim's butt and that the Defendant never placed his penis inside the victim's mouth.

The victim testified that the Defendant showed the victim computer images of naked animals which resembled Pokemon characters. The victim said this occurred more than once. The victim recalled that one of the characters appeared to be "half person, half . . . bull or something." He said the character had horns and was naked. The victim said the character's hand was on its penis and white ejaculate was coming out of it. The victim said the Defendant showed him other, similar images.

The victim testified that he revealed the abuse to his brother and grandmother around Christmas when the victim was age twelve. The victim said they had been playing Monopoly, that he mentioned the Defendant's name, and that his brother stated the Defendant had asked the brother to show the Defendant his penis when the brother was a child. The victim said this prompted him to reveal the abuse. He said he told his brother "everything." He said his grandmother was present but did not say anything. He said that he wanted something to happen and that he "made" his grandmother call his mother. He said that when his mother picked him up, she stated, "[W]ell, he won't go over there anymore then, don't worry about it." The victim said he thought this was "stupid" and "made" his mother call his father. The victim said that the police became involved and that he gave a forensic interview to a woman shortly after he told his brother and grandmother about the abuse.

The victim did not recall if he told the forensic interviewer about the Defendant's making the victim urinate on the Defendant. He acknowledged that the video recording of the interview did not reflect that he had mentioned it to the interviewer. He said he had not told the interviewer that the Defendant made him urinate on the Defendant's butt. The victim did not recall having said something like "you got out lucky" when his brother told him about what the Defendant had asked the brother to do.

The victim testified that the first incident occurred after his tenth birthday, which was in August 2012. He said the first incident occurred when he was in fifth grade. He agreed that he told the forensic interviewer that the abuse occurred fifty-two times and that he never felt comfortable telling his family how many times the abuse occurred. The

victim said he estimated the number of occurrences based upon his having gone to the Defendant's father's house every other weekend for two years. The victim did not recall if he told the first police officer who responded that the Defendant pointed the gun at the victim.

The victim did not recall how many times the Defendant made him anally penetrate the Defendant. The victim said that if the recording of the forensic interview reflected that anal penetration occurred ten times, the correct number would be "around ten times." When asked why he told the forensic interviewer that the Defendant "tried to" put the victim's penis in the Defendant's mouth, the victim stated the Defendant would begin performing oral sex but that the victim would make excuses, such as that the Defendant's beard was irritating, to get the Defendant to stop. The victim did not recall if he specifically told the forensic interviewer that the Defendant put the Defendant's mouth on the victim's penis. The victim did not remember if he told the police about the Defendant's making the victim urinate on the Defendant's face and did not think he told this to the forensic interviewer. The victim said he first disclosed this to the prosecutor a month or two before the trial.

The victim's grandmother testified that she played Monopoly with the victim and the victim's brother in December 2014. She said the victim stated that the Defendant had sexually abused him. She agreed the victim provided detailed information. She said she had been "livid." She said the victim stated he had tried to tell several people but no one paid attention to him. She said she told the victim she would call his parents the next day and that she would take him to the authorities if his parents did not do anything. She said she did not call the police because it was midnight on New Year's Eve. She said she called the victim's parents the next day.

The victim's mother testified that she learned of the sexual abuse when her mother called her and advised her of the victim's disclosure of sexual abuse by the Defendant. She said that she spoke to her husband and that he called the police. She said an officer came to their home on January 1, 2015, that he took a report, that the officer did not formally interview the victim, and that the officer advised them regarding what would happen next.

The victim's mother testified that she took the victim to a meeting with a Child Protective Services (CPS) employee whose name she thought was Ashley. She said they met with CPS twice in 2015. She said she also took the victim to Nashville Children's Alliance in February and to Our Kids in March. She said that the victim was interviewed

at Nashville Children's Alliance and that a medical examination was performed at Our Kids.

The victim's paternal grandmother testified that she had known the Defendant for almost seventeen years. She thought he had been born in 1984 and was about twenty-eight years old. She said the Defendant had known the victim since the victim's birth. She said she and the Defendant's father used to be coworkers and became romantically involved. She said she had lived intermittently in the same household as the Defendant and the Defendant's father in 2005, 2012, and 2013. She said that she lived with them for the entire year of 2013 and that she moved to Florida in January 2014. She said that after she moved to Florida, she visited every two to four months and stayed with the Defendant's father and the Defendant. She said the victim visited her almost weekly when she lived with the Defendant's father and the Defendant.

The victim's grandmother testified that she shared a downstairs bedroom with the Defendant's father and that the Defendant's bedroom was upstairs. She said the victim slept upstairs for overnight visits.

The victim's grandmother said the Defendant bought things for the victim and took the victim to restaurants and allowed the victim to order from the adult menu. She said, "They hung out quite a bit together," and she thought it was unusual for the Defendant to give the victim this much attention. She said the Defendant and the victim were home alone at times. She said that the victim had access to a cell phone in 2013 and that the Defendant called and sent text messages frequently. The victim's grandmother stated that she said something to the Defendant and the victim about the cell phone usage, which she thought was unusual.

The victim's grandmother testified that she had seen the Defendant tickle the victim near the victim's groin. She said this happened several times, beginning when the victim was around age three to four. She said it was still occurring when the victim was ten to twelve years old.

The victim's grandmother testified that she learned of the allegations in a telephone call from the victim's mother after Christmas 2014. She said she had visited Tennessee and had stayed in the Defendant's father's house over Christmas 2014. She said the victim had visited her while she was there and that he had stayed upstairs most of the time he was at the Defendant's father's house.

-7-

Lillie Kennedy, a former Nashville Children's Alliance forensic interviewer, testified that she interviewed the victim on January 26, 2015. She identified a video recording of the interview, which was played for the jury.

In the recording, the victim stated that his grandmother's boyfriend's son had been sexually abusing him for two years. He said he had been at his other grandmother's house during Christmas break and had talked with his brother about how the Defendant was weird. He said that his grandmother called his mother and that his mother said to "let it go" and not worry about it because the victim would not go to the Defendant's father's house anymore. The victim said they called his father because his mother had not seemed appropriately concerned.

In the recording, the victim said he went to the Defendant's father's house on Christmas afternoon 2014 and stayed "until Sunday." He said he went to his other grandmother's house on Monday. He said that while he and his brother were at the other grandmother's house, the victim's brother said the Defendant had asked the victim's brother "to molest him basically" and that the victim's brother had walked away. The victim said that his parents had been in another room and that his brother had been able to walk away but that the victim's parents had been in another part of town and that the victim had not been able to walk away.

In the recording, the victim said that the Defendant had asked the victim's mother when she was going to tell the victim "about everything or whatever," that the victim's mother had said the victim did not need to be told anything, and that the Defendant showed the victim "everything" in the Defendant's "college books." The victim said the Defendant had "all this stuff that was weird," including "silicone dragons and stuff." The victim said the abuse started in fifth grade.

Regarding the first time the Defendant touched him, the victim said in the recording that the Defendant showed him a silicone object and that the Defendant made the victim shower with him. The victim described the object as "some kind of toy or something." He said the object was a dragon's mouth with a hole on one side and was cylindrical. He said the Defendant said he put it in hot water and the hot water made it do something.

In the recording, the victim said that the Defendant had toys and "lube" and that whenever the victim showered when others were asleep or away from home, the Defendant got in the shower with him. The victim said the Defendant brought the lubricants into the shower, applied them to the Defendant's hand, and rubbed the victim's

penis. When asked how the Defendant used the lubricant, the victim said the Defendant put it into the dragon's mouth. The victim said the Defendant put the dragon's mouth over the Defendant's penis. The victim said the Defendant sometimes forced the victim to put the dragon on the victim's penis.

In the recording, the victim said the Defendant had an expensive stuffed animal with zippers to "hold that kind of thing." The victim said Defendant showed the victim that the stuffed animal had zippers on its butt and stomach. When asked where the Defendant obtained the sexual toys, the victim said that he did not know where the Defendant obtained the bear but that some of the other toys and the lubricant from a "website called dragon something."

When asked what the Defendant did with a teddy bear, the victim said in the recording that the Defendant put toys and lubricant in it. The victim said the Defendant sometimes did this when the victim was showering. The victim said the Defendant never made him "do it with the bear." The victim said the Defendant sometimes placed the dragon head inside the bear. The victim said the Defendant also had a green toy and a pink and blue toy, and the victim drew the shape of these toys on a large sheet of paper that is visible in the video recording. The victim said the Defendant stated the toys were fun. The victim said the Defendant made him do the same things with the toys, other than the bear, that the Defendant did with them.

The victim said in the recording that the lubricant was slick like shampoo and was white or clear. He said the Defendant used the lubricant "to make it slick so he could put his penis in."

The victim said in the recording that the sexual abuse occurred many times and that he visited the Defendant's father's home every other weekend. When asked if the abuse occurred more or less than ten times, the victim responded "a lot more." He estimated the abuse occurred fifty-two times and said it occurred every other weekend since he had been in fifth grade.

In the recording, the victim said the sexual abuse occurred in the Defendant's bedroom, in the computer room, and in the shower. The victim said he slept on the downstairs couch or in his room at the Defendant's father's house. He said he had his own room upstairs. He said his sister usually slept in their grandmother's room.

The victim said in the recording that the Defendant used a detachable showerhead to try to find the victim's sensitive spots. The victim said this included the back of his

legs and his groin. The victim said the Defendant touched the victim's private parts in the shower.

In the recording, the victim said the Defendant tried to make the victim put the victim's penis in the Defendant's butt about ten times. The victim said his penis penetrated the Defendant's anus. When asked if penetration occurred every time, the victim said, "I guess," and explained that he "tried to block it out." The victim said this occurred on the Defendant's futon. The victim said the Defendant made the victim sit, "used the lube," and tried to make the victim put the victim's penis in the Defendant's butt. The victim agreed that his penis sometimes went inside the Defendant's anus during the acts on the futon. The victim said he came up with "a stupid excuse" to leave the room to stop these incidents. He said the Defendant told him that he would need to know how to do this for later in life.

In the recording, the victim said the Defendant tried to "suck" the victim's penis. The victim said that this happened "almost every time" and that he came up with excuses, such as that the Defendant's beard scratched the victim's legs, to make the Defendant stop. The victim said the Defendant never placed the Defendant's penis in the victim's mouth.

The victim said in the recording that the Defendant masturbated him by grabbing the victim's penis with the Defendant's lubricated hand and "yanking it." The victim said the Defendant also made the victim masturbate the Defendant.

In the recording, the victim said the Defendant used the word "masturbation" and talked about "orgasms." The victim said the Defendant's orgasms were "gross" and involved "this hot white stuff" which came from the Defendant's penis after the Defendant masturbated himself.

The victim said in the recording that the last sexual act happened on the Saturday after Christmas. The victim said that he had been in the shower, that his grandmother left with her boyfriend to take the victim's sister home, that the Defendant entered the shower, and that the incident ended quickly because the victim's grandmother and her boyfriend returned home. The victim said the Defendant heard the garage door open and rushed from the shower to dress. The victim said "nothing much" happened in the shower because the Defendant "didn't get a chance to start anything."

In the recording, the victim said the Defendant showed the victim a website "of people drawing with . . . animals and stuff . . . without their clothes on." The victim said

-10-

the animals looked like Pokemon characters. The victim said the Defendant had a physiology textbook.

Ms. Kennedy testified that her goal in conducting a forensic interview was not to obtain every detail. She said that she tried to limit interviews to about an hour and that in some cases, attempting to obtain every detail "could take days."

Ms. Kennedy identified a drawing of one of the Defendant's sex toys that the victim made during the interview. The drawing was received as an exhibit.

Metro Nashville Police Detective Robert Carrigan testified that Detective Jeff Wiser, who had been the lead detective in the present case, was retired at the time of the trial. Detective Carrigan said that on March 20, 2015, Detective O'Quinn, Detective Mayo, and he assisted Detective Wiser in searching the house where the Defendant lived and in which the alleged abuse occurred. Detective Carrigan said the search warrant included items that had been specifically described by the victim. Detective Carrigan said they found items for which they were looking upstairs in the Defendant's bedroom and in a computer room across the hall. He said they also seized a "couple of things" from a guest bedroom upstairs.

Detective Carrigan identified two books found in the Defendant's bedroom, which he said contained anime and comic-book style drawings of dragons having sex. He said a photograph taken in the Defendant's bedroom depicted a large wolf or dog stuffed animal, which he said the police did not seize. Referring to photographs, Detective Carrigan said the police found "dragon tail dildos" and "lots of bottles of lube" in the Defendant's dresser drawer. Detective Carrigan said a black pistol, which was depicted in a photograph exhibit, was found in the Defendant's bedroom. Detective Carrigan said the police also seized computers, cell phones, and other, unspecified "digital items." He said that one of the bottles of lubricant they seized had a red label and that of the eleven bottles seized, four contained white lubricant and seven contained clear lubricant. He said one of the items the police seized was a lime green "dragon tail dildo" with a hole at the bottom and at the top. He said another seized item was a similar pink and blue item with a hole at the bottom that was "sort of shaped like a vagina" and a hole at the top. He said a third item, which was red and black, was shaped like a dragon's mouth with teeth on the front and a hole on each end. He agreed that DNA testing was not performed on the sex toys and that no child pornography was found.

The victim was recalled and identified the bottles of lubricant as ones he had seen when the Defendant applied lubricant to the Defendant's hand or the toys. The victim

-11-

was shown unspecified items and identified "[t]he green one" as having been used on the Defendant's and his penises. The victim also identified "the dragon" and said it was used in the same manner as the green item on the Defendant's and the victim's penises. The victim identified a pink and blue item and said it was used in the same manner as the other two.

Metro Nashville Police Detective Chad Gish, an expert in digital forensics, testified that he extracted data from two cell phones, hard drives from three computer towers, and a flash drive related to this case. He said he obtained relevant evidence from a cell phone and a hard drive.

Detective Gish testified that the data he recovered included "animation pornography," most of which was stored on a computer. He identified photographs, which were received as exhibits, and said they were a representative sample of the animation pornography.[1] He said the metadata showed that some of the images had been placed in the folders on the hard drive on February 4, 2015; January 27, 2015; January 30, 2015; and February 8, 2015.

Detective Gish testified that he recovered internet search queries and browsing history from one of the computer hard drives. He identified a document as a partial list of Google searches recorded on the computer hard drive. He identified a March 7, 2013 search query as "I was tickled till I peed as a kid." He said April 18, 2013 searches were performed for "If your child asked would it be okay to masturbate, what would you say?" and "Would you allow your child to walk around the house naked?" He said a September 26, 2013 search was conducted for "bad dragon Bruce with cum tube." He said a search was performed on January 4, 2015, for "Curtis Ledbetter, Nashville, Tennessee."[2] On January 9, 2015, searches were conducted for "Tennessee penalty for conviction of child abuse" and "Tennessee penalty for conviction of child molestation." On February 6, 2105, the computer was used to search for "sealed indictment."

Detective Gish testified that a Skype account had been installed on the computer recovered from the Defendant's bedroom. Detective Gish said that the screen name for the Skype account was "youko.shinryu," that the full name was Youko Shinryu, and that the account was established on June 26, 2012. Detective Gish identified a document

---

[1] The record reflects that the trial court limited the number of admissible pornographic images to a representative sample.
[2] Other evidence showed that the Defendant, who was indicted as "Jeremy Randall C. Ledbetter, was commonly known as "Curtis."

-12-

containing July 2013 Skype chat messages exchanged between Youko Shinryu and a person whose screen name was "ktcopache" and whose user name was Tay Ferret. In the chat messages, Youko Shinryu asked Tay Ferret, "[H]ypothetically speaking, if the laws were different here, would do anything with a kid?" Tay Ferret responded that he would "assuming [it's] consensual." Youko Shinryu stated, "[I] would, so long as it were con[s]ensual and they initiated the interaction." In further messages, Youko Shinryu stated that he would ask a child if the child "wanted to," agreed he would not want to do anything coercive, and said he would ensure the child "understood what they were getting into." Youko Shinryu said, "I greatly appreciate my [freedoms] and would not do anything to violate them lol. So, this stuff is fun to imagine but of course, not worth going to jail for. . . . [I]f a child were to really approach me in real life in a sexual way, [I]'d probably freak out and start hollering for them to get away[.]" Tay Ferrett said he would not do well in prison, and Youko Shinryu agreed and responded that a person's life would be ruined after incarceration because a person would not be able to obtain a "decent job." The discussion turned to the age of consent in other parts of the world and in states within the United States.

Detective Gish testified that a cell phone recovered in the search contained Skype chat messages between Youko Shinryu and Tay Ferrett. Detective Gish said messages associated with the same account but sent or received using different devices sometimes, but did not always, synced to all devices associated with a Skype user's account. Detective Gish said the chat messages between these individuals, which were documented in an exhibit, occurred from November 20, 2014 through December 12, 2014. In the messages, Youko Shinryu reported having found a drawing he made with a "dragon with a dick and a puddle." Tay Ferret responded, "Hehe, nice." Tay Ferret also stated, "I do know I tried dawing [sic] some sexy dragons before that drawing I posted." Youko Shinryu said, "I thought I had gotten rid of everything of mine, [I'm] a terrible artist . . . but one was spared from the femous [sic] . . . I got a hardbound book on the way[.]" Tay Ferret asked, "[W]ith sexy dragons?" and Youko Shinryu responded, "Yup[.]" Youko Shinryu stated, "I wish there were some peeing dragons, but alas it seems none of them had to potty[.]" Tay Ferret said, "[D]ragon pee is hot. Literally!" Youko Shinryu said, "[D]epends on the dragon, I bet ice [dragon's] pee is probably kinda a [sic] cold[.]"

In the chat messages from the cell phone, Youko Shinryu said he "liked the idea" of performing oral sex on a person who needed to urinate and lost bladder control during the sexual act. Tay Ferret said this sounded "really sexy." Youko Shinryu said, [U]sually, I imagine when I was a kid, something that I would have liked to do and something I wanted done to me . . . so in my imagination the penis is always pretty small

-13-

when they push it in, that way [I'm] not choked[.]"  After Tay Ferret said, "[S]maller is better for cases like this," Youko Shinryu stated, "[I've] always kinda liked small penises[.]"

As the chat continued, Youko Shinryu asked if Tay Ferret had "friends that indulge in pee play with you?"  After Tay Ferret said no, Youko Shinryu said, "I have 1, but I had to groom him for 10 years to do it[.]"  Youko Shinryu said the person never volunteered and that Youko Shinryu always had to ask him.  Youko Shinryu said that he and this individual had "done blow jobs, hand jobs" and that the individual "[doesn't] like anal" and "[can't] take anal[.]"  Youko Shinryu said the individual "[can't] give blow jobs . . . and [isn't] great at hand jobs[.]"  Youko Shinryu added, "[H]e's just a buddy that [I] mess around with every once in a while, maybe a couple times in a year, if that[.]"  When Tay Ferret asked what "kinda pee stuff" Youko Shinryu and the individual had engaged in, Youko Shinryu responded, "[I've] gotten him to pee inside of me a few times, and [I've] tried to drink from him twice[.]"

After reading the chat messages to the jury, Detective Gish testified that the Defendant owned the cell phone with the Skype chat messages between Tay Ferret and Youko Shinryu.  He said he never determined the identity of Tay Ferret.

Detective Gish testified that he did not recover any human pornography from the devices he analyzed.  He agreed that the search engine queries for penalties for child abuse or child molestation and for sealed indictments occurred after the police investigation began.

The Defendant testified that he never placed lubricant on his hand and rubbed the victim's penis.  The Defendant said he never put his hand around the victim's penis and had the victim urinate in the Defendant's mouth.  The Defendant said he never made the victim masturbate in the Defendant's presence with the green sex toy or the pink and blue sex toy.  The Defendant admitted he masturbated with a sex toy in the victim's presence.  The Defendant said he never performed oral sex on the victim in the computer room.  The Defendant stated he never forced the victim to put the victim's penis in the Defendant's anus.

The Defendant testified that he lived at his father's house in an upstairs bedroom.  The Defendant said that he had known the victim all of the victim's life and that the victim visited the house to see his grandmother and to "get away from his family."  The Defendant said he and victim played video games and watched television or movies

-14-

during the victim's visits. The Defendant estimated that the victim visited twelve to fourteen times but did not specify in what time period.

The Defendant testified that during the visits, the victim sometimes hit the victim's groin. The Defendant thought the victim might be starting puberty and experiencing erections. The Defendant said that he told the victim to talk to the victim's father, mother, or guidance counselor and that the victim said he would not talk to these individuals or anyone. The Defendant thought this occurred around the end of 2012. The Defendant said he sent a text message to the victim's mother and inquired whether "he knew anything about that." He said she responded that the victim did not know and did not need to know. The Defendant said that on one occasion when the victim was hitting himself, the Defendant told the victim that hitting himself was not the way to deal with the situation and that there were other ways to deal with it. The Defendant said he told the victim about masturbation, lubricants, and "the birds and the bees." The Defendant said that when the victim first began hitting himself, the Defendant restrained the victim. He said he had been concerned about the force with which the victim had hit himself. He said that, at some point, he asked the victim why the victim hit himself and that the victim said something like, "[I]t was getting stiff." The Defendant denied that he ever touched the victim sexually.

The Defendant testified that after he had the masturbation conversation with the victim, the Defendant left the computer room to allow the victim time to digest the information. The Defendant said that after he returned, the victim took out the victim's penis and began masturbating. The Defendant said he froze and did not tell the victim to stop or leave the room. The Defendant thought they had a conversation about what was appropriate and what was inappropriate in the presence of other people, but the Defendant did not recall when this conversation may have taken place.

The Defendant testified that after one or two incidents of the victim's masturbating in his presence, the Defendant became aware that the victim seemed to have discomfort from masturbation, but the Defendant did not recall the specific conversation. The Defendant said that he told the victim that alternatives to using the victim's hand existed and that the Defendant showed the victim his sex toys. The Defendant said he gave the victim a "clinical" explanation of how to use the toys and denied that he ever forced the victim to use the toys. The Defendant said, "I left it as his option if he wanted to pick it up, use it or leave it there." The Defendant said he did not touch the victim or put lubricant in the victim's hand, but the Defendant said he allowed the victim access to the lubricant. The Defendant said, "I took [the lubricant] out and put it in the room and explained what it was and what he could use it for." He thought the lubricant he provided

-15-

had been introduced into evidence previously. He said he bought lubricant in bulk because it had been on sale. He agreed that he also provided the toys to the victim and agreed that the lubricant and the toys were to be used together. He said the victim used the green toy and the pink and blue toy. The Defendant did not think the victim ever used the red and black dragon toy.

The Defendant denied showering with the victim. The Defendant said the victim masturbated in the victim's bedroom. The Defendant said he tried to talk to the victim about it but that the conversation was awkward and that the Defendant "let him do his own thing." The Defendant denied watching the victim masturbate but said he was sure he had glanced or seen motion but had not looked for an extended period of time. The Defendant said he had been playing computer games or watching a movie and "kind of ignoring" the victim's masturbation. The Defendant said that he suggested that the victim masturbate at home but that the victim said he was not allowed to close or lock doors.

The Defendant testified that he was a "furry," which he said was a person attracted to fictitious animalistic characters. He said he was attracted to dragons and griffins. He said a website called Bad Dragon catered to people with this sexual interest. He said the website "create[d] dildos and male [penile] devices what would kind of mimic what we believe those creatures would have."

The Defendant testified that he "crossed the line" by deciding it was acceptable for him to masturbate at the same time as the victim. The Defendant said that when he did so, he was not "engaged with" the victim and that he was attracted to the images depicted in the pornography that had been shown to the jury, not to people. The Defendant said that when he masturbated in the room with the victim, the Defendant had been looking at images on his computer. The Defendant said he was not sexually attracted to the victim. The Defendant said he and the victim had masturbated in the same room, but the Defendant "wasn't masturbating to [the victim] or for [the victim]." The Defendant claimed his masturbating was unrelated to the victim's presence in the room. The Defendant agreed that the lubricant and sex toys were used during the mutual masturbation occurrences.

The Defendant testified that he looked at the pornographic images on his computer and that he did not force the victim to view them. The Defendant said, however, that the victim looked at them on occasion but said the victim "didn't seem to have any interest in them." The Defendant said that the victim asked about the images and that the Defendant told the victim, "[I]t's the stuff that I look at."

-16-

The Defendant testified that he asked the victim to urinate on him once. The Defendant said that the victim said he needed to use the restroom, that the Defendant asked if the victim "would be okay with" urinating on the Defendant, that the victim agreed, and that the victim urinated on the Defendant's chest and shirt. When asked why he had asked the victim to do this, the Defendant said he enjoyed urination "[i]n a sexual way." The Defendant agreed he asked the victim to urinate on him for the Defendant's sexual gratification. The Defendant said he did not ask the victim to urinate on him again because the Defendant "did not have that need, have that desire." The Defendant said the victim's age was unrelated to the Defendant's desire for the victim to urinate on him. The Defendant said that he had had this interest when he was a child but that he was not interested in children specifically. He said a person's age was immaterial.

The Defendant testified that he never threatened the victim with a gun or showed the victim a gun in a threatening manner but that the victim had seen guns he and his father owned and had shot a gun with the Defendant and the Defendant's father at the victim's grandmother's house. The Defendant said he and his father each owned a black nine-millimeter pistol. He said his gun and his father's guns were slightly different. He agreed that his gun was found in his room during the execution of the search warrant.

When asked about his March 2013 computer search related to whether boiling a silicone toy could damage it, he explained that he wanted to ensure he cleaned his toys properly "after personal use."

The Defendant testified that he was stressed, scared, and hurt when he learned of the allegations. He said that as soon as he learned of possible criminal charges, "[W]e started looking into getting legal advice," and that he performed Google searches for his names and the "laws . . . for these things I have been accused of." He said he learned of the term "sealed indictment" from trial counsel. He acknowledged that allowing the victim to masturbate in front of him had been "very inappropriate" but said he did not think it was criminal.

The Defendant testified that he had been told to expect a search warrant and that he did not do anything to prepare for it. He said he left all of his sexually related items where they were. He noted that he had the opportunity to get rid of the things that the jury had seen but had not. He acknowledged that he did not learn about the allegations involving sex toys until after they were recovered in the search. He agreed that he had thought the masturbation activity had not been illegal and that he would not have disposed of anything that was noncriminal.

-17-

The Defendant testified that he was introverted, played video games, and worked. He acknowledged that he was Youko Shinryu in the Skype chat messages. Regarding a July 9, 2013 Skype chat between himself and Tay Ferret, whom the Defendant identified as a "furry artist and story writer," the Defendant said their conversation about sexual activity with children and the age of consent was the result of a story of Tay Ferret's that the Defendant had read. The Defendant said he had an interest in urination and had held his urine until the last minute as a child. He said his friend with whom he had engaged in "pee play" was named "R." and was close to his age. The Defendant said he was age twenty-nine. The Defendant said he had known R.'s family since the Defendant was thirteen or fourteen. The Defendant said his mother "kind of took in" R. and R.'s two sisters. He said he, R., and R.'s older sister "discovered the furry fandom." The Defendant said, "[I]t just blossomed into a whole other thing. It really shaped my life though, I guess, you could say." The Defendant said he had been referring to R. when he said in the Skype chat that he had groomed someone for ten years.

The Defendant testified that he had "been with" two people and that the last encounter had been about five years ago. He said that when he had been younger, he had been attracted to Digimon and Pokemon and had been less interested in boy/girl relationships that children at school discussed.

The Defendant denied any interest in biological animals. When asked if he was aware of examples of his having "search[ed] biological animals for sexual gratification," he said he had conducted the searches to understand their anatomy. When asked about specific search histories involving animals and sexual matters, he acknowledged that the searches were his. He said the searches had been for understanding of anatomy and for comparison with "any type of furry story that I was reading at the time." He said the stories he read described things such as creatures urinating on themselves or fellating themselves and that being able to see an animal doing these acts was helpful in imagining it in the context of the stories. He acknowledged a December 12, 2014 Skype chat with Tay Ferret in which he said he loved raccoons and kangaroos and found their genital configuration "sexy." He said the stories had animals of this type in them but that the animals in the stories were sentient, not feral. He said he would not "do anything with a feral animal." He said his remark in the Skype chat about enjoying a kangaroo urinating on him was merely internet discussion and not activity in which he would engage in reality.

The Defendant testified that his Skype discussion with Tay Ferret about fellating someone with a small penis and having the person urinate in his mouth was in reference

-18-

to R. and had been a fantasy the Defendant had when he had been younger. He agreed that he had said in the Skype chat he had not engaged in this conduct yet and that he had not been referring to something that had happened years ago with R. The Defendant acknowledged an interest in human urination. He said, "To a point, I'm not attracted to every person that would do that. It's not about them being a person that makes them attractive."

The Defendant acknowledged that his internet searches related to human male urination had been for sexual gratification "probably to a point." He did not know why he had searched for images of World War II soldiers masturbating.

The Defendant disagreed that cell phone records showed that the Defendant was always the one who encouraged the victim to come to the Defendant's father's house. The Defendant said that the victim sometimes asked to come to the house and said the victim's mother sometimes dropped off the victim. The Defendant could not explain why his cell phone and Facebook messages did not contain any messages in which the victim asked to come to the house.

After receiving the evidence, the jury found the Defendant guilty of the charged offenses of two counts of aggravated sexual battery, two counts of soliciting sexual exploitation of a minor, one count of exploitation of a minor by displaying sex acts, and two counts of rape of a child. After a sentencing hearing, the trial court imposed an effective eighty-one-year sentence. This appeal followed.

## I & II
## Sufficiency of the Evidence and
## Election of Offenses

The Defendant contends that although the "direct and circumstantial evidence is overwhelming," the evidence does not support convictions of the incidents elected by the State. He also argues that, to the extent his testimony and the victim's testimony conflicted, the Defendant's testimony was credible and was corroborated by other evidence. With respect to the aggravated sexual battery convictions, the Defendant contends in a related issue that the election of offenses was inadequate. The State contends that the evidence is sufficient to support all of the convictions and that its election of the offenses was adequate relative to the aggravated sexual battery counts. We conclude that the evidence is sufficient to support all of the convictions and that, although the elections as to the two counts of aggravated sexual battery were inadequate, the errors were harmless.

-19-

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009))

When evidence is presented of multiple offenses that would fit the allegations of the charge, the State must elect the particular offense for which a conviction is sought, and the trial court must instruct the jury as to the need for jury unanimity regarding the finding of the particular offense elected. *See, e.g., State v. Brown*, 762 S.W.2d 135, 137 (Tenn. 1988); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997). "The purpose of election is to ensure that each juror is considering the same occurrence. If the prosecution cannot identify an event for which to ask [for] a conviction, then the court cannot be assured of a unanimous decision." *State v. Shelton*, 851 S.W.2d 134, 138 (Tenn. 1993).

> This election requirement . . . ensures that a defendant is able to prepare for and make a defense for a specific charge. Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the same offense.

*State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000). The critical reason, however, for the election is to protect a defendant against "patchwork verdicts." *Shelton*, 851 S.W.2d at 137.

> [T]he election requirement has been applied almost exclusively in the sex crimes context, and specifically, when the defendant is alleged to have committed a series of sexual acts over a lengthy period of time against young children who are unable to identify the exact date on which any one act was perpetrated.

*State v. Johnson*, 53 S.W.3d 628, 631 (Tenn. 2001) (citing *State v. Brown*, 992 S.W.2d 389 (Tenn. 1999)). "[T]he State may introduce evidence of sex crimes allegedly committed against the victim during the time frame charged in the indictment, but, at the close of the proof, the State must elect the facts upon which it is relying for conviction." *Id.* (citation omitted). "If a jury is allowed to convict without specific evidence supporting the election, then the election is superficial and meaningless." *State v. Johnny Lee Hines*, No. 01C01-9709-CC-00405, 1999 WL 33107, at *4 (Tenn. Crim. App. Jan. 27, 1999). "The offense must be proven in accordance with the election, i.e., to have occurred on [the elected] date and under [the] circumstances." *State v. Marvin D. Nance*, No. E2005-01623-CCA-R3-CD, 2007 WL 551317, at *6 (Tenn. Crim. App. Feb. 23, 2007) (citing *Johnny Lee Hines*, 1999 WL 33107, at *6), *perm. app. denied* (Tenn. May 14, 2007). Relative to an election of offense,

> [T]he standard for sufficiency of the evidence applies to the designation of offenses as though it were an element of the offenses. Not only must the state's election identify and distinguish offenses sufficiently to allow the trier of fact to render discrete and unanimous verdicts on each, the state must . . . support this election with evidence sufficient for a reasonable trier of fact to find that the offenses occurred as elected beyond a reasonable doubt.

*Johnny Lee Hines*, 1999 WL 33107, at *4.

### A.    Rape of a Child

"Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522. The State elected the following instances of rape of a child as the bases for prosecution:

-21-

**Count 6:** The Defendant performed oral sex on the victim in the computer room.

**Count 7:** The Defendant pushed the victim down on the futon, applied lubricant to the victim's penis, and placed the victim's penis in the Defendant's anus.

The Defendant has not raised any specific argument relative to the adequacy of the election relative to the rape of a child counts. We decline to speculate in the absence of an argument.

With regard to Count 6, the victim testified that he and the Defendant had been in the computer room with the Defendant manually masturbating the victim when the Defendant stated he wanted to do something new. The victim said the Defendant bent down and placed the victim's erect penis in the Defendant's mouth. The undisputed evidence showed that the victim was older than age three and younger than age thirteen when these events occurred. This evidence, viewed in the light most favorable to the State, is sufficient to support the conviction in Count 6.

With regard to Count 7, the victim described an incident in which the Defendant pushed the victim onto the futon, applied lubricant to the victim's penis, got on top of the victim, and placed the victim's penis inside the Defendant's anus. The evidence showed that the victim was older than age three and younger than age thirteen when this occurred. In the forensic interview, which was received as substantive evidence, the victim stated that about ten acts of anal penetration occurred on the futon and described incidents consistent with the one he recounted in his trial testimony. Viewed in the light most favorable to the State, the evidence is sufficient to support the conviction in Count 7.

## B.  Aggravated Sexual Battery

"Aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . [who is] less than thirteen (13) years of age." *Id.* § 39-13-504(a)(4). The State elected the following instances as the bases for prosecution:

**Count 1:** The Defendant placed lubricant in his hand and rubbed the victim's penis.

**Count 2:** The Defendant placed his hand around the victim's penis and had the victim urinate in the Defendant's mouth.

The Defendant contends that the evidence shows that Counts 1 and 2 were "generic evidence cases" subject to the guidelines of *State v. Qualls*, 482 S.W.3 1 (Tenn. 2016). When the State relies on generic evidence, whereby a defendant has abused a victim over a period of time and the victim cannot practically recall or recount specific incidents or dates for an offense, the State is not required to elect specific act or incident as the basis for each charge. *Id.* at 16. In such a case, the trial court must instruct the jury that in order to find the defendant guilty, it must find beyond a reasonable doubt that the State proved that all of the acts described by the victim occurred. *Id.* at 17.

Relative to Count 1, the victim testified that the second encounter with the Defendant occurred in the computer room. The State argues that the evidence is sufficient to show the Defendant's guilt of Count 1 based upon the incident in which the victim said the Defendant was masturbating himself while playing a computer game. The victim said that the Defendant ejaculated, that the Defendant made the victim sit in a chair in front of the Defendant, that the Defendant placed his arms around the victim, and that the Defendant masturbated the victim. The State is correct that this evidence is sufficient to support a conviction of aggravated sexual battery.

However, error exists relative to the State's election for this count. First, the State elected an incident in which lubricant was used, but the incident the State cites on appeal to support the conviction did not involve evidence related to lubricant. In addition, the record reflects evidence of multiple incidents of aggravated sexual battery involving the use of lubricant. The victim testified that he and the Defendant were in the computer room and that the Defendant was masturbating the victim with the Defendant's hand and that the Defendant went on to perform oral sex on the victim. In the forensic interview, the victim stated that the Defendant masturbated the victim by grabbing the victim's penis and "yanking it." The victim also stated in the forensic interview that during the showers the Defendant took with him, the Defendant brought lubricant into the shower, applied it to the Defendant's hand, and rubbed the victim's penis. Thus, evidence existed of multiple aggravated sexual battery incidents in which the Defendant placed lubricant in his hand and rubbed the victim's penis. As such, the State's election did not adequately identify a specific act or incident which formed the basis of the charge.

The record reflects that the trial court considered the State's election of the offense or act which comprised Count 1 to be adequate. In considering the issue, the court said, "[D]o we have specific allegations [sufficient] enough to apprise [the Defendant] of what the allegations are and requiring – require that he be given a fair trial under our

-23-

constitution, not to be subject to double jeopardy, and I think the answer is yes." The court stated it had considered *Qualls* and said, "[H]ere we don't have indistinguishable acts. We've got specific information as to address, location within that address, within that house, specific conduct occurring and alleging within this election of offenses that would apprise [the Defendant] of what the allegations are." The court observed that the defense had acknowledged that the Defendant had done "horrible bad things" with the victim "but not criminal in nature" and that the defense had not attempted to show that the Defendant had been elsewhere at the time the offenses occurred. Although the jury instructions are not in the appellate record, the generic evidence instruction prescribed by *Qualls* was discussed by the attorneys and the court, and it is apparent from the record that the court did not intend to give the instruction because it concluded the election adequately identified discreet offenses. *See Qualls*, 482 S.W.3d at 17; *see also* T.P.I.—Crim. 42.25(a) (pattern jury instruction). From this, we conclude that either the State should have provided an adequate election or, if it chose to proceed upon generic evidence, that the court should have given the generic evidence instruction.

Because the right to an adequate election is a fundamental constitutional right, we must conduct a constitutional harmless error analysis. *Qualls*, 482 S.W.3d at 17-18. In that regard, the Defendant is entitled to relief unless the error was harmless beyond a reasonable doubt. *Id.* at 18 (citing *State v. Climer*, 400 S.W.3d 537, 569 (Tenn. 2013)). In making this determination, the reviewing court must determine "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Climer*, 300 S.W.3d at 569.

As the trial court observed, the Defendant did not rely upon an alibi defense. He acknowledged that he had advised the victim about sexual matters which included the mechanics of male masturbation, had exhibited pornographic images to the victim, had provided lubricant and sex toys and had allowed the victim to use them, had masturbated in the victim's presence, had been present when the victim masturbated, and had the victim urinate on the Defendant for the Defendant's sexual pleasure. The Defendant denied, however, that he had any sexual contact or sexual intercourse with the victim. The victim's testimony and the Defendant's testimony stood in direct opposition on the questions of sexual contact and sexual intercourse. The jury found the Defendant guilty as charged in the indictment of four counts – two of rape of child and two of aggravated sexual battery – involving sexual contact or sexual intercourse. By its verdict, the jury indicated it credited the victim's testimony and rejected the Defendant's testimony that his actions with the victim did not include sexual contact and sexual intercourse. We conclude that, had the generic evidence instruction been given, the jury would have found that all of the incidents involving the Defendant's applying lubricant to his hand and rubbing the victim's penis occurred and that the jury would have returned a guilty

verdict. As such, we conclude that the error was harmless beyond a reasonable doubt. The Defendant is not entitled to relief on this basis.

Turning to Count 2, the State argues that the evidence is sufficient to support the conviction based upon the victim's testimony that, after the incident in which the Defendant masturbated while playing a computer game, the Defendant had the victim sit in a chair in front of the Defendant and masturbated the victim, the Defendant placed his hand on the victim's penis, placed the victim's penis in the Defendant's mouth, and had the victim urinate in the Defendant's mouth. Although the Defendant denied he ever had the victim urinate in the Defendant's mouth, the victim testified otherwise. The jury's verdict indicates that it credited the victim's testimony and rejected that of the Defendant.

With regard to the election for Count 2, the evidence adduced at the trial established the incident described in the previous paragraph, as well as the victim's testimony that the Defendant made the victim urinate in the Defendant's mouth on multiple occasions. The victim testified that whenever he said he was going to the bathroom, the Defendant would ask if he had to urinate, and that if the victim said yes, the Defendant would make the victim "pee on his face and . . . in his mouth and stuff." Thus, the evidence showed multiple incidents involving conduct which conformed with the State's election relative to Count 2. As with Count 1, the proper course was for the State to have provided an election which specifically described a discreet occurrence or for the trial court to have given the jury instruction prescribed by *Qualls*.

As with Count 1, the jury was faced with a choice of whether to believe the victim, who testified that the Defendant touched the victim's penis with the Defendant's hand and mouth for the purpose of sexual gratification, or to believe the Defendant, who testified that no sexual contact occurred. No alibi defense was raised. The jury's verdicts relative to the two rape of a child counts indicate that it credited the victim's testimony and rejected the Defendant's testimony. Due to the nature of the conflicts in the evidence, the jury's verdict as to Count 2, although rendered in a situation involving either an inadequate election or an inadequate jury instruction depending upon the route chosen by the State, supports a conclusion that the jury rejected the Defendant's blanket claim of no sexual contact. We conclude that if the generic evidence instruction had been given, the jury would have found that all of the incidents involving the Defendant's placing his hand around the victim's penis and having the victim urinate in the Defendant's mouth occurred and that the jury would have returned a guilty verdict. As such, we conclude that the error was harmless beyond a reasonable doubt. The Defendant is not entitled to relief on this basis.

-25-

## C. Soliciting Sexual Exploitation of a Minor

The Defendant was convicted of two counts of soliciting sexual exploitation of a minor. The relevant statute was amended during the time period covered by the indictment, January 1, 2012 to December 31, 2014. Because the victim, whose birthdate was August 22, 2002, testified that the sexual activity began when he was ten years old and in the fifth grade and that he began fifth grade in Fall 2012, we will focus on the statute as it existed effective July 1, 2012.[3]

The relevant statute provided, in pertinent part:

It is an offense for a person eighteen (18) years of age or older, by means of oral . . . communication, . . . directly or through another, to intentionally command, hire, persuade, induce or cause a minor to engage in simulated sexual activity that is patently offensive or in sexual activity, where such simulated sexual activity or sexual activity is observed by that person or by another.

T.C.A. § 39-13-529(a) (Supp. 2012) (subsequently amended).

The State elected the following conduct for the counts related to solicitation of sexual exploitation of a minor:

**Count 3:**  The Defendant made the victim masturbate with the green silicone dragon sex toy.

**Count 4:**  The Defendant made the victim masturbate with the pink and blue silicone dragon sex toy.

The Defendant argues that, although the State's evidence showed that the Defendant used sex toys on the victim, the victim did not testify that he used the green or pink and blue toys on himself. The record reflects otherwise. The victim testified about the Defendant's having used both toys to masturbate the victim. However, the Defendant

---

[3] We note that the only changes between the 2011 version of subsection (a) of Code section 39-13-529 and the 2012 version involved rearranging words within the statute. The phrase "simulated sexual activity that is patently offensive or in sexual activity" had previously been "sexual activity or simulated sexual activity that is patently offensive." Also, the subsequent phrase "simulated sexual activity or sexual activity" in the 2012 version had previously been "sexual activity or simulated sexual activity." Before 2012, the statute had contained a reference to another statute which defined the term "patently offensive," which was deleted from the 2012 version.

has overlooked his own testimony. When asked which toys the victim used on himself, the Defendant said, "The green one – the lime green one, and the pink and blue one." The evidence showed, as well, that the Defendant provided the lubricant and toys, instructed the victim in their use in order to relieve an erection, was present when the victim masturbated, and saw the victim masturbating. The evidence is sufficient to support the convictions. The Defendant has not raised a specific election issue relative to Counts 3 or 4, and we decline to speculate in the absence of an argument.

## D.    Exploitation by Displaying Sexual Acts to a Minor

The relevant statute was amended during the time period covered by the indictment. As with Counts 3 and 4, we will focus on the statute as it existed after the amendment effective July 1, 2012. The statute provided:

(b)    It is unlawful for any person eighteen (18) years of age or older; directly or by means of electronic communication, to intentionally:

(1)    Engage in simulated sexual activity that is patently offensive or in sexual activity for the purpose of having the minor view the simulated sexual activity or sexual activity, including circumstances where the minor is in the presence of the person, or where the minor views such activity via electronic communication, including electronic mail, Internet service and webcam communications[.]

*Id*. § 39-13-529(b)(1) (Supp. 2012) (subsequently amended). The State elected to prosecute Count 5 based upon the Defendant's masturbating himself with the green silicone sex toy in the victim's presence. The victim testified he witnessed the Defendant masturbating with the green toy. The Defendant admitted that he masturbated while the victim was present. The evidence is sufficient to support the conviction. The Defendant has not made a specific argument relative to the adequacy of the State's election relative to this offense, and again, we decline to speculate in the absence of an argument.

Because the evidence is sufficient as to each count and because the errors related to the election of offenses related to Counts 1 and 2 were harmless beyond a reasonable doubt, the Defendant is not entitled to relief.

-27-

# III

## Denial of a Severance

The Defendant contends that the trial court erred in denying his pretrial motion for a severance of each count of the seven-count indictment. The State responds that the court properly denied the motion. We agree with the State.

Tennessee Rule of Criminal Procedure 8(b) provides the following with regard to joinder of offenses:

> (b) **Permissive Joinder of Offenses.**—Two or more offenses may be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13, if:
>
> > (1)     the offenses constitute parts of a common scheme or plan; or
> >
> > (2)     they are of the same or similar character.

Tennessee Rule of Criminal Procedure 14(b) provides, in pertinent part:

> (b) **Severance of Offenses.—**
>
> > (1)     **Involving Permissive Joinder of Offenses.**—If two or more offenses are joined or consolidated for trial pursuant to Rule 8(b), the court shall grant a severance of offenses in any of the following situations:
> >
> > (A)     **Before Trial.**—Before trial on motion of the state or the defendant when the courts finds a severance appropriate to promote a fair determination of the defendant's guilt or innocence of each offense.

When considering a motion to sever, the trial court

> must conclude that: (1) the offenses are part of a common scheme or plan; (2) evidence of each offense is relevant to some material issue in the trial of all the other offenses, Tenn. R. Evid. 404(b)(2); and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission would have on the defendant, Tenn. R. Evid. 404(b)(3); *Spicer* [*v. State*, 12 S.W.3d 438, 445 (Tenn. 2000).]

-28-

*State v. Denton*, 149 S.W.3d 1, 13 (Tenn. 2004). Proof of a larger "plan or conspiracy . . . contemplates crimes committed in furtherance of a plan that has a readily distinguishable goal, not simply a string of similar offenses." *Id*. at 15.

If a defendant seeks a severance of offenses that have been joined in the original indictment pursuant to Rule 8(b), the defendant has the burden to move for a severance to and show that the criteria of Rule 14(b)(1) have been met in order to obtain a severance. *Spicer*, 12 S.W.3d at 443. Permitting or denying a motion to sever is within the discretion of the trial court. *State v. Meeks*, 867 S.W.2d 361, 369 (Tenn. Crim. App. 1993); *see State v. Coleman*, 619 S.W.2d 112, 116 (Tenn. 1981). This court reviews a trial court's decision to grant or to deny a motion to sever for an abuse of discretion. *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999). An abuse of discretion occurs when a "trial court applie[s] an incorrect legal standard or reache[s] a decision against logic or reasoning which cause[s] an injustice to the complaining party." *Denton*, 149 S.W.3d at 10 (citing *Spicer*, 12 S.W.3d at 442).

At the hearing, Detective Wiser testified for the State about his investigation and the victim's forensic interview. Detective Wiser said he arranged for and later reviewed the forensic interview. He said the victim described the sexual conduct as having occurred consistently over a period spanning from when the victim was age ten and in the fifth grade until the end of 2014. Detective Wiser said the victim related that about fifty-two incidents of abuse occurred, all taking place when the victim visited the Defendant's father's house. Detective Wiser said the victim reported that the abuse occurred upstairs in the Defendant's bedroom, in the computer room, and in the shower, and that the victim's grandmother and the Defendant's father never came upstairs. Detective Wiser said the victim reported sexual activity "every time he took a shower over at his grandmother's house." Detective Wiser said the victim reported that the Defendant "had been using silicone dragons with him." Detective Wiser acknowledged that the silicone toys were not used every time. Detective Wiser said the victim said the Defendant applied lubricant to the Defendant's fingers, rubbed the lubricant inside a silicone toy, placed the toy over the Defendant's penis, and "ram[med] it." Detective Wiser said the victim described a stuffed animal with zippers, which the Defendant used with the silicone toys for "ramming it over his penis." Detective Wiser said the victim reported that the Defendant made the victim use the silicone toys on the victim. Detective Wiser said the victim reported about ten incidents in which the Defendant made the victim anally penetrate the Defendant. Detective Wiser said the victim stated that the Defendant "would try and suck it" and that the victim came up with excuses such as claiming the Defendant's beard was scratching the victim's legs in order to get the Defendant to stop. Detective Wiser said the victim reported that the Defendant applied lubricant to the Defendant's hand and "would grab his penis and start yanking it . . . with the lube on his

-29-

hand and with the toys." Detective Wiser said the victim also reported that the Defendant made the victim manually masturbate the Defendant. Detective Wiser said the victim reported that the Defendant showed him computer images of naked Pokemon-type characters. Detective Wiser said he executed a search warrant and recovered items which corroborated the victim's account in the forensic interview. The items included sex toys and lubricants described by the victim and a computer.

The State argued at the hearing that the case involved a single victim having been abused by the Defendant over a period of time. The State posited that this showed a common scheme or plan to abuse the victim and that the evidence of all counts was admissible at the trial of any single count, provided the State made an election at the close of its case-in-chief regarding the specific incident upon which it sought a conviction. The State argued, therefore, that if the court severed each count, the evidence at each trial "would essentially be the same." The State argued, as well, that joinder of the offenses promoted judicial economy.

The defense argued that the State had not shown a distinctive design constituting the existence of a signature crime. The defense noted that the crimes were alleged to have occurred over a three-year period and were "not the same transaction" and that caselaw did not support a conclusion that sexual gratification constituted a continuing plan or conspiracy. The defense also argued that evidence of the other offenses was not materially relevant to show motive, identity, or absence of mistake or accident. The defense claimed that the "spill-over effect" of trying the counts together, particularly the counts of rape of a child and aggravated sexual battery, created more prejudice than probative value. The defense posited that the jury would "lump it all together" and convict the Defendant of all counts. The defense argued that, notwithstanding the State's argument about judicial economy, the Defendant's right to a fair trial was paramount.

In a written order denying the motion, the trial court found that the evidence demonstrated a common scheme or plan which linked the charged offenses, noting that the Defendant used his connection with the victim through the Defendant's father and the victim's grandmother to commit the offenses, that the offenses occurred at the Defendant's father's house, that the offenses involved similar sex toys, and that they occurred in the same area of the house. The court found, as well, that evidence of each offense would be admissible in the trial of all the other offenses pursuant to *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994) and that the probative value of the evidence of each offense was not outweighed by the danger of unfair prejudice.

On appeal, the Defendant does not challenge the trial court's findings that the offenses are part of a common scheme or plan or that evidence of each offense is relevant

to some material issue in the trial of all the other offenses. Instead, he argues that the court erred in denying the motion because the probative value of the evidence of additional offenses was outweighed by the danger of unfair prejudice. He argues that the he was prejudiced by the jury's having heard evidence of numerous offenses occurring over an approximate two-year period and involving different types of sexual activity, circumstances, and locations. He argues, as well, that because he admitted "having some culpability as to some counts," the risk of unfair prejudice from evidence of multiple crimes was heightened. He claims that his "strange sexual fetishes with anime pornography, various sexual toys[,] and urophilia" all but foreclosed the jury's ability to consider each count separately.

The evidence at the hearing showed that the Defendant engaged in a continuing course of sexual abuse of the victim when the victim visited the Defendant's father's house. Although the abuse involved different sexual acts and conduct, similarities existed among the offenses in that they involved the same victim and took place in the Defendant's upstairs living area, especially the shower, of the Defendant's father's house.

The Defendant admitted limited sexual conduct in the victim's presence, which included self-masturbation and witnessing the victim masturbating with toys and lubricant provided by the Defendant. The trial court limited the admissibility of the pornographic and fetish evidence to representative excerpts. The evidence of the numerous offenses and their similarities was highly probative of the Defendant's concerted effort to abuse the victim over a period of years, thereby establishing a common scheme or plan. *See* Tenn. R. Evid. 404(b). The Defendant's abuse of the victim conformed, in large part, to his sexual fetishes related to animated fantasy creatures and urination, which were relevant to his motive. *See id.* We conclude that the trial court did not err in determining that the probative value of the evidence of additional offenses outweighed the danger of unfair prejudice.

In reaching our conclusion, we have considered the Defendant's citations to *Spicer* and *State v. Hoyt*, 928 S.W.2d 935 (Tenn. Crim. App. 1995), *overruled on other grounds by Spicer*, 12 S.W.3d at 447. Both *Spicer* and *Hoyt* involved a defendant charged with sexual abuse of multiple victims occurring in an extended time period specified in the indictment. In *Hoyt*, the defendant was charged with one count of aggravated rape of each of two victims and one count of sexual battery of a third victim. With regard to the two aggravated rape counts, this court said that, notwithstanding the evidence of a common scheme or plan and the relevance of the evidence of each offense to each other as the two victims, the evidence of multiple acts of abuse as to each victim would be unfairly prejudicial relative to the charge related to the other and that the probative value was outweighed by the danger of unfair prejudice. *Hoyt*, 928 S.W.2d at 945. This court

concluded that the trial court erred in failing to sever the charges for each of these two victims. *Id.* The *Hoyt* court also held that the alleged aggravated sexual battery of the third victim was not part of the common scheme or plan in the alleged abuse of the other two victims and that the trial court's failure to sever the charge related to the third victim was error. *Id.*

In *Spicer*, the defendant was charged with sexual offenses in two indictments charging that the crimes occurred over a period of time. Each indictment pertained to a different victim. *Spicer*, 12 S.W.3d at 442. The State sought consolidation of the offenses but failed to offer evidence of a common scheme or plan at the consolidation hearing. *Id.* at 445-47. The supreme court held that, in the absence of proof to support the State's motion, the trial court abused its discretion in consolidating the offenses. *Id.* at 447. The supreme court observed, "[J]oinder of open-dated indictments involving multiple victims is usually prejudicial because *State v. Rickman* seems to allow the jury to hear evidence of countless sexual episodes from each of the different victims." *Id.* at 448.

We are not compelled by *Hoyt* or *Spicer*, both of which involved multiple victims. The concerns of unfair prejudice present in these cases are not analogous to the Defendant's case, involving a single victim and strong probative value of the other acts evidence. The trial court did not abuse its discretion in denying the motion to sever. The Defendant is not entitled to relief on this basis.

**IV**

**Evidentiary Ruling Regarding the Defendant's Internet Searches**

The Defendant contends that the trial court erred in denying his motion in limine to exclude evidence related to his internet searches. He complains, as well, that the trial judge, who was a successor judge in the case, erred by revisiting the issue after the original judge had ruled on the motion. The State contends that the court did not abuse its discretion. We agree with the State.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevance of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v.*

*Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006). Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

The record reflects that the Defendant filed a pretrial motion in limine seeking exclusion of Detective Gish's testimony about the Defendant's computer search terms and chat messages relative to "sex and children." The Defendant argued that the searches and chat messages were irrelevant because they did not provide evidence of the commission of a crime and that they were unfairly prejudicial, confused the issues, and wasted time.

Judge J. Randall Wyatt, Jr., the original trial judge, conducted a hearing on the motion. The trial court summarized the testimony at the hearing:

> Detective Gish testified that he found thousands upon thousands of files of anime, or cartoon, pornography on the Defendant's digital drives. He testified that he created a sample file that contained a variety of different types of anime pornography he found. He testified that he could not remember exactly from where each item in the sample file was recovered. He testified that if a file had been saved on the drive at the time it was taken into police custody, he could tell when that file was last accessed. He testified that if a file had been deleted, he could not tell when that file was last accessed. He testified that he also found a number of pornographic search terms in the Defendant's browser history as well. He testified that he could not see a time stamp for those search terms for which the browser history had been deleted. He finally testified that there were also chat messages discussing the legal and moral theory of having sex with a child. He testified that he believes the chat messages are from sometime in 2014. He testified that there are timestamps on those messages. He testified that none of the material he found was illegal, but that he did find it vile and offensive.

The trial court recognized three categories of evidence in question: anime pornography, pornographic search terms, and chat messages that discussed having sex with a child. Relative to anime pornography, the court recognized the probative value of the evidence in light of the victim's statement in the forensic interview "that the Defendant showed him something like 'Pokemon'" pornography. The court found that corroboration of the victim's testimony was highly probative and relevant to the State's case and that the evidence could be "very prejudicial" to the defense. The court ruled that a limited amount of the anime pornography files was admissible to corroborate the victim's testimony but that any probative value of evidence regarding the number of files containing pornography was substantially outweighed by the danger of unfair prejudice. Regarding the pornographic search terms, the court found that evidence of search queries containing the word "Pokemon" were relevant as corroborative of the victim's testimony and that the relevance was not outweighed by the danger of unfair prejudice. The court found, however, that the probative value of evidence of the Defendant's general search terms involving pornography, including searches for bestiality, were substantially outweighed by the danger of unfair prejudice. Finally, regarding the chat messages that discussed having sex with a child, the court deferred its ruling until a jury-out hearing could be had at the trial. The court found that the evidence appeared to be relevant and highly probative but that the court needed the context that it "could gain from seeing how the trial has proceeded before making a final ruling[.]"

Judge Wyatt retired after he had ruled on the motion in limine, and the case was assigned to Judge Steve R. Dozier, who presided at the trial. After the victim testified during the State's case-in-chief at the trial, Judge Dozier conducted a jury-out hearing regarding the admissibility of evidence of the chat messages and internet searches.

Detective Gish testified at the jury-out hearing about Skype chat messages from the Defendant's computer between the Defendant, who used the name Youko Shinryu, and an individual who used the name Tay Ferret. Detective Gish also testified about Skype chat messages from the Defendant's cell phone between the Defendant and an individual who used the name Gray Hacks.

Detective Gish testified about July 2013 Skype chat messages between the Defendant and Tay Ferret that discussed having sex with a child if the laws were different and the age of consent laws in other jurisdictions.

Detective Gish also testified about December 3, 2014 Skype chat messages between the Defendant and Tay Ferret about the Defendant's having found a childhood drawing of a dragon with a penis and "a puddle." The Defendant asked if Tay Ferret was "planning on adding anything pee related" to some drawings.

Detective Gish testified that in a December 12, 2014 Skype chat, the Defendant told Tay Ferret that he had "participated in the naughty dragon [P]atreon project" and had been disappointed that "Nars didn't enter anything." The Defendant stated he had a book of dragons "on the way," and he responded "Yep," when asked if they were "sexy dragons." In the December 12 chat, the Defendant stated, "[O]ne of my goals for the past year was to be able to drink my own pee and now I can do it straight from the tap," after which the Defendant and Tay Ferret discussed how to accomplish this act. The Defendant also stated to Tay Ferret that he liked the idea of performing oral sex on someone who had to urinate and having them lose bladder control. The Defendant said he imagined this happening with someone "three inches or smaller grapping my head and pushing it all the way in[.]" The Defendant asked if Tay Ferret had any friends who "indulge in pee play" with Tay Ferret. The Defendant stated he had such a friend but "had to groom him for ten years." The Defendant stated he and this friend had engaged in "blow jobs, anal, and hand jobs." The Defendant said the friend "[c]an't give blow jobs and isn't that great at hand jobs" and did not like anal sex due to bleeding. The Defendant also discussed in the chat a video of a raccoon masturbating and mentioned other animals engaged in urination or orgasm.

The State directed the trial court to a document containing a lengthy Skype chat discussion between the Defendant and Tay Ferret regarding urination and how the Defendant viewed it as being sexually pleasurable. The State also directed the court to a document containing Skype chats on an unspecified date between the Defendant and Tay Ferret, in which they discuss urination and the perils involved in the legal system. The Defendant stated in the same conversation that seeing a dog urinate on itself was "sexy."

Detective Gish also recounted November 27, 2014 chat messages from the Defendant's cell phone between the Defendant and an individual who used the name Gray Hacks, in which the Defendant asked whether Gray Hacks would engage in "wild and crazy gay sex" involving specified sexual positions. Detective Gish said that in December 11, 2014 chat messages between the Defendant and Gray Hacks, the Defendant asked if Gray Hacks could come over after work and stated the Defendant's desire for Gray Hacks to "pee for" the Defendant. The Defendant stated he would appreciate Gray Hacks's "staying well hydrated, to the point you are peeing clear and often." The Defendant also stated that being well hydrated caused a person to have more ejaculate, for orgasms to last longer, and for the ejaculate to taste better. The Defendant also said that a person needed to ejaculate "when you start the water thing" for "cleaning everything out" and making the person feel better.

-35-

The State sought a ruling allowing it to introduce evidence of some of the Defendant's internet searches which did not involve pornographic Pokemon images. When Judge Dozier asked why the State had not presented this evidence to Judge Wyatt at the pretrial hearing, the prosecutor stated that he did not know and that "none of us were present for that hearing." The State then offered documents showing the following April 2013 internet searches recovered from the Defendant's computer:

1.      If your child asks, would it be okay to masturbate, what would you say?

2.      Would you allow your child to walk around the house naked?

The State also offered documents reflecting that the Defendant's computer had been used in January and February 2015 for the Defendant's name, the Tennessee penalty for a conviction of child abuse, the Tennessee penalty for a conviction of child molestation, and the term "sealed indictment." The State offered another document reflecting a September 26, 2013 search for "Bad Dragon Bruce with Cum Tube." The State offered a document reflecting a March 11, 2013 search, "Can boiling a silicone toy damage it?" The State offered a document reflecting a March 7, 2013 search, "I was tickled until I peed as a kid."

The trial court ruled that the internet search terms were admissible. The court observed that the weight to be given the evidence was a matter for the jury's consideration and found that the probative value of the evidence was not outweighed by the danger of unfair prejudice pursuant to Tennessee Rule of Evidence 403.

Regarding the Skype chat messages between the Defendant and Gray Hacks, the trial court found that the discussions of urinary tract infections[4] and sexual positions were not relevant, were unfairly prejudicial, and were inadmissible unless the Defendant's testimony made them relevant. The court ruled that the discussion of the Defendant's childhood dragon drawing was admissible because it was relevant to "an animal that he later obtains" that had been described by the victim as half human and half animal. The court ruled that the discussion "about animals and what they can and can't do" was irrelevant and therefore inadmissible. The court found that the discussion of books and sexy dragons was relevant and that the probative value was not outweighed by the danger

---

[4] The documents containing the cell phone chat messages were not made exhibits at the hearing. Detective Gish did not testify about any discussion in the messages of urinary tract infections. However, the State submitted documents for the court's consideration without having Detective Gish testify as to their complete contents.

of unfair prejudice. The court ruled that discussion of drinking water before "pee play" was relevant and admissible. The court also ruled that the discussion of the Defendant's having groomed an individual for sexual contact for ten years and the details of that contact were admissible. The court found that the evidence was "highly more probative than unfairly prejudicial." The court found that the evidence about videos of urinating raccoons was not relevant.

We begin with the Defendant's argument that Judge Dozier erred in allowing the State to present additional evidence regarding the Defendant's internet search history. The Defendant claims, without citation to authority to support his argument, that the issue was moot because Judge Wyatt had already considered and ruled upon the admissibility of the Defendant's internet search terms. The Defendant claims that the information had been presented previously to Judge Wyatt, who "deemed [it] prejudicial." As we have stated, the record of the hearing conducted by Judge Wyatt is not in the record. *See* T.R.A.P. 24(b) (stating that the appellant has the obligation to have a transcript of the evidence or proceedings prepared); *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983) (stating that the Defendant has the burden of preparing a record which presents a fair, accurate, and complete account of what transpired in the trial court regarding the appellate issues.) Judge Wyatt's order reflects that he considered the admissibility of "pornographic search terms" and ruled that they were inadmissible. Nothing in the record before us reflects that the internet search terms considered by Judge Dozier had been considered previously at the hearing conducted by Judge Wyatt.

In any event, the Defendant has not identified any basis upon which he was prejudiced as a result of the State's belated request to offer evidence of the additional internet searches. Interlocutory orders of a trial court are subject to reconsideration before the litigation is complete, including the power of a successor judge to reverse the order of the previous judge. *State v. Gary R. Owens*, No. 1248, 1990 WL 5259, at *2 (Tenn. Crim. App. Jan. 25, 1990) (order on pet. for reh'g), *perm. app. denied* (Tenn. July 2, 1990).

The Defendant argues generally that the probative value of evidence of the searches was not outweighed by the potential for unfair prejudice. He claims that the searches did not contradict his testimony and that he did not deny having conducted the internet searches. He argues that the searches related to tickling and urination, boiling a silicone toy, talking to a child about masturbation, child nudity at home, and "Bad Dragon Bruce" did not involve the sexual assault of the victim and were highly prejudicial. Regarding the January and February 2015 searches for the Defendant's name, "sealed indictment," and Tennessee criminal penalties, the Defendant argues that no proof shows these searches were conducted before the victim made the allegations and

that the evidence shows they were conducted after the Defendant learned of the allegations.

The record reflects that Judge Dozier conducted the appropriate inquiry by weighing the probative value of the evidence of the searches against the danger of unfair prejudice to the Defendant. The searches related to tickling and urination, boiling a silicone toy, talking to a child about masturbation, child nudity at home, and "Bad Dragon Bruce" were relevant because the evidence showed that the Defendant had a fetish involving dragons and fantasy creatures, that the Defendant made dragon silicone sex toys available for the victim's use, that the Defendant used the toys on the victim and himself in the victim's presence, that the Defendant talked to the victim about "the birds and the bees" after the victim's mother declined to do it, and that the Defendant instructed the victim regarding the mechanics of masturbation with the sex toys and lubricants. Regarding the searches conducted after the allegations were made, they could be considered as evidence of the Defendant's culpability and guilty conscience. As the trial court observed, the question was one for the jury to determine in its role as the trier of fact. As to all of the internet searches, the record supports the trial court's determination that their probative value was not substantially outweighed by the danger of unfair prejudice.

Judge Dozier did not abuse his discretion in considering the issue of the admissibility of these searches and in ruling that they were admissible. The Defendant is not entitled to relief on this basis.

## V

## Sentencing

The Defendant contends that the trial court erred in applying an enhancement factor related to the abuse of private trust and in imposing an effective eighty-one-year sentence. He argues that the sentence is, in effect, a life sentence which violates the state and federal constitutions and the statutory sentencing guidelines. The State counters that the trial court did not abuse its discretion in sentencing and that the effective sentence presents no constitutional violation.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature

-38-

and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103, -210; *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2018).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id*.

The abuse of discretion with a presumption of reasonableness standard also applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id*. A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2019). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4) (2019); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

At the sentencing hearing, the victim testified that the Defendant's sexual abuse of him had been stressful and was something the victim thought about daily. The victim said he had missed school and tests but that he had been able to maintain good grades. He stated that, as a result of the abuse, he had been worried about and avoided talking to adults he did not know. When asked if the Defendant had been someone who had authority over him or to whom the victim looked upon as a caregiver, the victim said, "No, not really." He said he thought they had been friends. The victim said that he would have to think about the abuse for the rest of his life and that he would like the Defendant to receive the maximum sentences in order for the Defendant to have to think about the abuse for the rest of the Defendant's life, as well.

The presentence report was received as an exhibit and reflected that the Defendant was age thirty at the time of sentencing. He was a high school graduate, had completed some college, and had no prior criminal history. He reported good physical and mental health. He had been employed by the same employer from 2008 until his arrest in 2015 and had been unable to find work since then. The risk assessment evaluation assessed him as being at moderate risk for reoffending. A supplement to the presentence report stated that the Defendant had been treated by a mental health treatment center from March 2005 until September 30, 2014. His primary diagnosis at the time of discharge was "Major Depressive Disorder, Recurrent Episode, Severe Degree, no mention of psychotic behavior," and his secondary diagnosis was "Attention Deficit Disorder of childhood with hyperactivity."

In its written order sentencing the Defendant, the trial court recited its consideration of the relevant statutory sentencing principles and considerations. It found that the Defendant had abused a position of public or private trust in the commission of the offenses and enhanced the sentences on this basis. *See* T.C.A. § 40-35-114(14) (2019). In support of this determination, the court made the following findings:

> [T]he Defendant knew [the victim] his entire life. Additionally, the Defendant was approximately fifteen (15) years older than [the victim]. The Defendant lived with his father and [the victim's] grandmother. [The victim] stayed with his grandmother every other weekend. The court finds the Defendant stood in [a] relationship to [the victim] that promoted confidence.

The court found that no mitigating factors applied. *See id.* § 40-35-113 (2019).

For the two convictions for aggravated sexual battery, the Defendant, a Range I, standard offender, faced sentences of eight to twelve years for this Class B felony. The court set the sentences at ten years for each offense and imposed 100% service of the sentences. *See id.* § 40-35-501(i)(1), (i)(2)(H) (mandating 100% service for convictions of aggravated sexual battery) (Supps. 2012, 2013, 2014). For the convictions for solicitation of sexual exploitation of a minor, the Defendant faced Range I sentences of eight to twelve years for this Class B felony, and the court imposed ten-year sentences. For the conviction for displaying sex acts to a minor, the Defendant faced a Range I sentence of three to six years for this Class C felony. The court imposed a five-year sentence. For the two rape of a child convictions, the Defendant, classified as a Range II offender for these offenses pursuant to Code section 40-35-522(b)(2)(A), faced sentences of twenty-five to forty years for this Class A felony. The court imposed twenty-eight-year sentences, which were to be served at 100%. *See id.* § 40-35-501(i)(1)(I).

The trial court found that the Defendant qualified for consecutive sentencing because he

> committed two or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and the victim . . . , the time span of the defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim[.]

*Id.* § 40-35-115(b)(5) (2019). In applying consecutive sentencing factor (5), the court noted the evidence that the Defendant engaged in numerous incidents of multiple types of sexual offenses directed toward the victim, the approximate two-year period over which sexual abuse occurred, the Defendant's efforts to conceal the offenses by showing the victim a gun and threatening to kill the victim's family, and the victim's continued trauma as a result of the offenses. The court found, as well, that consecutive sentencing was appropriate to protect the public from the Defendant.

Based upon its findings, the court imposed the two sentences for aggravated sexual battery consecutive to each other and consecutive to each of the sentences for displaying sex acts to a minor and rape of a child. The court ordered the two sentences for rape of a child to be served consecutively to each other. The two sentences for solicitation of sexual exploitation of a minor were imposed concurrently with each other and concurrently with one of the rape of a child sentences, all yielding the effective eighty-one-year sentence.

## A.     Length of Sentences and Application of Enhancement Factor (14)

The Defendant argues that the trial court erred in applying enhancement factor (14), related to his abuse of private trust, to enhance his sentences. The trial court made detailed findings about the relationship between the Defendant and the victim, the nature of the Defendant's living arrangements, the victim's regular visits to the household to see a relative, and the age disparity between the Defendant and the victim. In addition, the victim's grandmother testified at the trial about the Defendant's paying an unusual amount of attention to the victim, buying things for the victim, communicating with the victim by cell phone and text message, and taking the victim to restaurants. The Defendant's chat messages indicate he groomed an individual for sexual activity for ten years, which corresponds to the victim's age at the time the offenses began. The Defendant had known the victim for all of the victim's life. In addition, the Defendant

stated in the Skype chat messages that he and the person he had groomed engaged in many of the same activities identified by the victim in the forensic interview and in his testimony.

The Defendant focuses on the victim's testimony that he did not view the Defendant as being in a position of authority or as a caretaker during the victim's visits at the Defendant's father's house. The trial court, however, was uncompelled by the victim's characterization at the sentencing hearing of the Defendant's lack of authority, given the totality of the evidence.

Upon review, we conclude that the trial court did not abuse its discretion in enhancing the Defendant's sentences based upon the abuse of private trust factor.

## B.    Consecutive Sentencing

The Defendant contends that the trial court abused its discretion in applying the consecutive sentencing factor related to the commission of two or more offenses involving sexual abuse of a minor. He argues that the court stated that it "must" consider the consecutive sentencing factors, thereby indicating that the court erroneously believed consecutive sentencing was mandatory, whereas the statute states that the sentencing court "may" impose consecutive sentences upon a finding of one or more consecutive sentencing factor. *See id.* § 40-35-115(b). We have considered the Defendant's argument and conclude that it is without merit. The record reflects that the court engaged in a careful consideration of the facts and the law. Nothing indicates that the court believed consecutive sentencing was mandatory. Rather, the court merely stated it must consider whether the factors of section 40-35-115 applied. We note, as well, that the court ordered only some of the sentences to be served consecutively, further supporting a conclusion that the court did not believe consecutive sentencing was mandatory.

The Defendant has failed to show that the trial court abused its discretion in applying the consecutive sentencing factor related to the commission of two more offenses involving sexual abuse of a minor.

## B.    Constitutionality of Sentences

The Defendant argues that his effective eighty-one-year sentence is grossly disproportionate in relation to the offenses and that incarceration for this period of time violates his rights pursuant to the Eighth Amendment to the United States Constitution and Article I, Section 16 of the Tennessee Constitution.

The Eighth Amendment to the United States Constitution and Article I, Section 16 of the Tennessee Constitution prohibit, inter alia, "cruel and unusual punishments." Our supreme court has said that the following methodology is appropriate for evaluating the proportionality of a defendant's sentence to his crime:

> [T]he sentence imposed is initially compared with the crime committed. Unless this threshold comparison leads to an inference of gross disproportionality, the inquiry ends—the sentence is constitutional. In those rare cases where this inference does arise, the analysis proceeds by comparing (1) the sentences imposed on other criminals in the same jurisdiction, and (2) the sentences imposed for commission of the same crime in other jurisdictions.

*State v. Harris*, 844 S.W.2d 601, 603 (Tenn. 1992) (citing *Harmelin v. Michigan*, 501 U.S. 2680, 2702-09 (1991) (Kennedy, J., concurring)).

The Defendant acknowledges our supreme court's *Harris* decision but requests that we adopt the dissenting justice's position in *Harris*. As an intermediate appellate court, we are bound by the majority decisions of our supreme court.

Thus, we will endeavor to analyze the Defendant's sentences as compared with the crimes committed to determine if gross disproportionality exists. *See id.* In that regard, we are unpersuaded. Sexual abuse of minors is, indeed, one of the most egregious offenses an individual can commit. The Defendant has not challenged the proportionality of any of his individual sentences. We note, however, that this court has said that no gross disproportionality exists between the offense of rape of a child and the mandatory sentence of at least twenty-five years. *See Brandon Lee Clymer*, No. M2016-01124-CCA-R3-CD, 2017 WL 5197292, at *16 (Tenn. Crim. App. Nov. 9, 2017), *perm. app. denied* (Tenn. Mar. 14, 2018). Likewise, our supreme court said in *Harris* that a twenty-year sentence was not grossly disproportionate to the offense of aggravated sexual battery. *Harris*, 844 S.W.2d at 603.

In the present case, the Defendant informed the victim about the nature of sexual encounters, instructed the victim in masturbation mechanics, provided sex toys and lubricants, and, ultimately, perpetrated sexual offenses upon the ten- to twelve-year-old victim on as many as fifty-two occasions over a two-year period. The Defendant engaged in specific acts, such as making the victim urinate on the Defendant, for the Defendant's sexual gratification. The Defendant's use of sex toys with the victim was consistent with the Defendant's dragon fetish. The eighty-one-year sentence is not

grossly disproportionate to the crimes committed, such as would support a constitutional violation by enforcement of the sentence.

The Defendant has cited several cases in which the defendants received effective sentences of less than eighty-one years for multiple convictions of sexual offenses against children. However, because we have concluded that the Defendant has failed to make a threshold showing of gross disproportionality between his effective sentence and the crimes he committed, further inquiry into sentences imposed on other defendants is not warranted. *See id.*

## C.  Cumulative Sentencing Errors

The Defendant argues that he is entitled to relief based upon cumulative errors in sentencing. The concept of cumulative error is that multiple errors, though harmless individually, cumulatively violate a defendant's right to a fair trial. *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010). The Defendant's argument must fail because we have rejected each of the Defendant's allegations of error related to sentencing.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE